



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLETTE MAYFIELD, CLAUDE MILLIEN,
and EBONY PORTER, individually and on behalf
of all persons similarly situated,

Plaintiffs,

-against-

ASTA FUNDING, INC., ASTA JOHN/JANE
DOES 1-20, PALISADES COLLECTION, LLC,
GARY STERN, PALISADES COLLECTION
JOHN/JANE DOES 1-20, PRESSLER &
PRESSLER, LLP, RICHARD A. FRANKLIN,
TIN-AN A. WANG, MITCHELL E. ZIPKIN,
CRAIG STILLER, and PRESSLER JOHN/JANE
DOES 1-20,

Defendants.



Civil Action No.:

**CLASS ACTION
COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Charlette Mayfield, Claude Millien, and Ebony Porter, on behalf of themselves

and all others similarly situated, for their complaint, allege, upon personal knowledge as to

themselves and information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this class action on behalf of thousands of New York City

residents who have been injured by Defendants' scheme to fraudulently obtain and enforce

consumer debt judgments worth millions of dollars, in violation of the Fair Debt Collection

Practices Act, 15 U.S.C. §§ 1692 *et seq.* (the "FDCPA"), the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1691 *et seq.* ("RICO"), New York General Business Law

section 349, and New York Judiciary Law section 487.

1

2.     This scheme was devised and executed by Asta Funding, Inc. ("Asta"), a publicly traded company in the business of purchasing and collecting charged-off consumer debts; Asta's wholly owned subsidiary, Palisades Collection, LLC ("Palisades Collection"); Asta's Chairman of the Board, President, and Chief Executive Officer, and Principal of Palisades Collection, Gary Stern ("Stern," and, together with Asta, Palisades Collection, Asta John/Jane Does 1-20, and Palisades Collection John/Jane Does 1-20, the "Asta Defendants"), which brought thousands of consumer debt actions on Asta's behalf; the Asta Defendants' law firm, Pressler & Pressler, LLP ("Pressler"), which litigated the actions; and Pressler attorneys Richard A. Franklin ("Franklin"), Tin-An Wang ("Wang"), Mitchell E. Zipkin ("Zipkin"), and Craig Stiller ("Stiller") (Pressler, together with Franklin, Wang, Zipkin, and Pressler John/Jane Does 1-20, the "Pressler Defendants").

3.     In or around 2004, Asta and Palisades Collection began purchasing consumer telecommunications debt from AT&T Wireless. At or around that same time, under the direction of Stern, the Asta Defendants, and their attorneys, the Pressler Defendants, began a scheme to collect those debts through the use of mass litigation to obtain default judgments against consumers without having, being able to obtain, or intending to obtain, the evidence necessary to prove their claims against those consumers in court. As part of this scheme, Defendants sued thousands of individuals in the New York City Civil Courts—many of whom never owed any debt to AT&T Wireless in the first place—on the basis of mass-generated and baseless "verified complaints," retained process serving agencies known to engage in "sewer service" to avoid notifying consumers of the lawsuits filed against them, and obtained entry of default judgments based on fraudulent affidavits. Defendants used and continue to use the improperly obtained

2

default judgments to seize consumers' wages and other assets. The Asta Defendants publicly refer to this scheme as the "legal strategy."

4. Over time, Defendants have used this scheme to extract from low-income New Yorkers millions of dollars that Defendants have not proved, and could never prove, are owed to them.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1692k(d), and 18 U.S.C. §§ 1961-68, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

6. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because it is the judicial district in which Plaintiffs reside, in which Defendants transact business, in which Defendants filed and litigated suits against Plaintiffs, and in which a substantial part of the events giving rise to Plaintiffs' claims occurred.

## PARTIES

7. Plaintiff Charlette Mayfield is a natural person residing at 223 W. 145th Street, Apt. 1B, New York, New York.

8. Plaintiff Claude Millien is a natural person residing at 912 East 178th Street, Apt. 1A, Bronx, New York.

9. Plaintiff Ebony Porter is a natural person residing at 1727 Walton Ave, Apt. 53A, Bronx, New York.

10. Defendant Asta is a corporation organized under the laws of Delaware. It has its principal place of business at 210 Sylvan Avenue, Englewood Cliffs, New Jersey. Asta is in the

3

business of purchasing, liquidating, and managing defaulted consumer receivables, including credit card accounts and telecommunication accounts. Asta generates revenues and earnings primarily through the collection of these receivables, which it purchases at substantial discounts on their face value.

11.     Defendants "Asta John/Jane Does 1-20" are persons associated with Defendant Asta who were involved in the violations of law alleged in this Complaint.

12.     Defendant Palisades Collection is a limited-liability company organized under the laws of Delaware. Like Asta, Palisades Collection has its principal place of business at 210 Sylvan Avenue, Englewood Cliffs, New Jersey. Palisades Collection is a wholly-owned subsidiary of Asta. Palisades Collection's registered agent in the State of New York is C T Corporation System, 111 Eighth Avenue, New York, New York.

13.     Defendant Stern is and was at all relevant times the Chairman of the Board, President, and CEO of Asta. Defendant Stern also is and was at all relevant times a Principal of Palisades Collection.

14.     Defendants "Palisades Collection John/Jane Does 1-20" are persons associated with Defendant Palisades Collection who were involved in the violations of law alleged in this Complaint.

15.     Together, Defendant Asta, Defendants Asta John/Jane Does 1-20, Defendant Palisades Collection, Defendant Stern, and Defendants Palisades Collection John/Jane Does 1-20 are the "Asta Defendants."

16.     Each of the Asta Defendants is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6), in that each is in the business of purchasing and collecting on defaulted debts that were originally owed to other entities.

4

17.     Defendant Pressler is a New Jersey limited liability partnership with its principal place of business at 7 Entin Road, Parsippany, New Jersey. Pressler also maintains offices at 305 Broadway, 9th Floor, New York, New York, among other locations. Pressler is a law firm and is regularly engaged in the business of collecting consumer debts via the mail, telephone, internet, and civil debt collection lawsuits, on behalf of its clients, including, but not limited to, Palisades Collection and Asta.

18.     Defendant Franklin is a natural person and an attorney who was at all relevant times employed at Pressler. Defendant Franklin regularly collects consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits.

19.     Defendant Wang is a natural person and an attorney who was at all relevant times employed at Pressler. Defendant Wang regularly collects consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits.

20.     Defendant Zipkin is a natural person and an attorney who was at all relevant times employed at Pressler. Defendant Zipkin regularly collects consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits.

21.     Defendant Stiller is a natural person and an attorney who was at all relevant times employed at Pressler. Defendant Stiller regularly collects consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits.

22.     Defendants "Pressler John/Jane Does 1-20" are persons associated with Defendant Pressler who were involved in the violations of law alleged in this Complaint.

23.     Together, Pressler, Pressler John/Jane Does 1-20, Defendant Franklin, Defendant Wang, Defendant Zipkin, and Defendant Stiller are the "Pressler Defendants."

24. Each Pressler Defendant is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6). in that each is regularly engaged in the business of collecting consumer debts via the mail, telephone, internet, and civil debt collection lawsuits on behalf of their clients. including, but not limited to, Palisades Collection and Asta.

## FACTS CONCERNING DEFENDANTS' SCHEME

Asta, Palisades Collection. and the Debt-Buying Industry

25. Defendant Asta is among the nation's largest "debt buyers"—that is, it buys defaulted, charged-off debts for pennies on the dollar, and then seeks to collect the full face value of the debts for profit.

26. Asta generates substantial revenues through collecting on purchased consumer debts, including through litigation.

27. Palisades Collection is a wholly owned subsidiary of Asta, and also is in the business of purchasing and collecting defaulted consumer debts.

28. Palisades Collection is run by the same management team that directs Asta, and Asta completely controls the activities of Palisades Collection. Asta's management, including Defendant Stern, considers Palisades Collection to be Asta's in-house debt collection agency.

29. The Federal Trade Commission (the "FTC") is charged with enforcing the FDCPA, which was enacted in 1977 to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e).

30. In fulfilling its duties under the FDCPA, the FTC undertook a multi-year investigation of the debt buying industry, which culminated in a report published in January 2013. Federal Trade Commission, The Structure and Practices of the Debt Buying Industry (Jan. 2013), *available at* www.ftc.gov/os/2013/01/debtbuyingreport.pdf (the "FTC Report").

6

31.     As part of that investigation, the FTC obtained voluminous documents from Asta and similar consumer debt-buying companies.

32.     In the FTC Report, the FTC found that the growth of the debt buying industry "raise[s] significant consumer protection concerns," since "debt buyers[] may have insufficient or inaccurate information when they collect on debts, which may result in collectors seeking to recover from the wrong consumer or recover the wrong amount." *Id.* at i. The information that the FTC collected from Asta and other top debt buyers demonstrated that "the sufficiency and accuracy of the information used in the collection of debts remains a significant consumer protection concern." *Id.* at 50.

33.     At FTC-sponsored roundtable discussions of debt collection in 2009 and 2010, at least two New York City legal services organizations reported improper litigation activity of Palisades Collection consistent with the violations of law alleged in this Complaint.

The Asta Defendants Purchased Telecommunication Consumer Debt From AT&T Wireless

34.     In or around 2004, Asta and/or Palisades Collection, at the direction of Stern, began purchasing telecommunications debts. By no later than 2005, these purchases included both landline and wireless consumer debts from AT&T.

35.     Specifically, in July 2004, Palisades Collection, at the direction of Stern, entered into a "Purchase and Sale Agreement" to purchase defaulted debts from AT&T Wireless. Palisades Collection made a series of purchases of such defaulted debts under the terms of the Purchase and Sale Agreement and amendments thereto.

36.     Palisades Collection purchased these AT&T Wireless debts for pennies on the dollar.

37.     On average, the country's largest debt buyers, including Asta, paid only four cents for each dollar of charged-off debt that they purchased between July 2006 and June 2009. FTC Report at 23, A-1.

38.     For debts purchased under the Purchase and Sale Agreement, Palisades Collection received from AT&T Wireless a spreadsheet containing limited information about each account— including the account holder's name, social security number, telephone number, address, account open date, last payment date, charge-off date, and alleged amount owed.

39.     Such spreadsheets containing the information provided from debt sellers to buyers are often referred to in the industry as "media" or "stream of data." FTC Report at 34-35.

40.     For debts purchased under the Purchase and Sale Agreement, Palisades Collection did not, at the time of purchase, obtain the original documentation underlying each debt. For example, it did not obtain any account agreements, account terms and conditions, account applications, signed contracts, original billing statements, payment records, or dispute histories.

41.     The Purchase and Sale Agreement provided that Palisades Collection could request certain documentation from AT&T Wireless for purchased accounts at no cost *only* until 9 months after the date of purchase, or until AT&T Wireless supplied records for 10% of the purchased accounts, whichever was earlier. After that point, but *only* until two years after the date of purchase, Palisades Collection could purchase that documentation at a cost.

42.     AT&T Wireless generally did not provide Asta and/or Palisades Collection signed contracts, account terms and conditions, or certain other categories of account documentation.

8

The Pressler Defendants, at the Direction of the Asta Defendants, Commenced Thousands of Lawsuits Without Proof or Review

43. By 2005, Asta and/or Palisades Collection, under the direction of Defendant Stern, had implemented a scheme to collect purchased debt from consumers through litigation.

44. Defendant Stern called this scheme the "legal strategy."

45. The "legal strategy" scheme involved the use of mass litigation, by and through the Pressler Defendants and other law firms, to obtain default judgments against consumers on claims for purchased debts, including the AT&T Wireless debts, and use those judgments to seize consumers' wages and other assets.

46. The Asta Defendants were unconcerned about potential countersuits by the alleged debtors over any wrongful acts Defendants undertook as part of the "legal strategy" scheme, viewing such countersuits as part of their overhead—simply another potential cost of doing business.

47. The Asta Defendants retained the Pressler Defendants to commence lawsuits on behalf of Palisades Collection to collect purchased AT&T Wireless debts from New York City consumers.

48. Asta Defendants and Pressler Defendants together developed and implemented the Pressler Defendants' litigation strategy.

49. The Asta Defendants agreed to pay the Pressler Defendants a percentage of monies collected on these debts.

50. Pursuant to the Asta Defendants' retainer agreement with Pressler, Pressler was required to provide the Asta Defendants with monthly reports, and the Asta Defendants were permitted to conduct audits of the Pressler Defendants' implementation of the Defendants' litigation strategy.

9

51. Primarily in 2005 and 2006, the Pressler Defendants, at the direction of the Asta Defendants, commenced thousands of lawsuits in New York City Civil Court in the name of Palisades Collection seeking to collect purported AT&T Wireless debts.

52. In 2006, Palisades Collection was the plaintiff in approximately thirty-nine percent of all consumer credit filings in New York City Civil Court—more than any other consumer credit plaintiff.

53. In 2006, Pressler served as plaintiff's counsel in approximately one-third of all consumer credit filings in New York City Civil Court—more than any other law firm.

54. In 2005, Palisades Collection was the plaintiff in nearly 34,000 cases in New York City Civil Court.

55. Pressler represented Palisades Collection in nearly 20,000 of those cases.

56. In 2006, Palisades Collection was the plaintiff in more than 60,000 cases in New York City Civil Court.

57. Pressler represented Palisades Collection in over 38,000 of those cases.

58. In 2007, Palisades Collection was the plaintiff in more than 12,000 cases in New York City Civil Court.

59. Pressler represented Palisades Collection in approximately 1,500 of those cases.

60. On information and belief, the vast majority of the nearly 60,000 lawsuits Palisades Collection and Pressler filed in 2005, 2006, and 2007 were to collect AT&T Wireless debts.

61. Defendants often commenced hundreds of consumer credit filings on the same day.

10

62.     The Pressler Defendants, at the direction of the Asta Defendants, initiated each suit with a verified complaint.

63.     These verified complaints were all generated using the same form and were virtually identical to one another. The primary differences were the names of the defendants, the account numbers, and the amounts sought.

64.     Each complaint stated: "This communication is from a debt collector."

65.     Each complaint was signed and verified by a Pressler attorney, including Defendants Franklin and Wang.

66.     In the verification accompanying each complaint, the Pressler attorney stated on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which the attorney believed to be true. The verification also stated that the Pressler attorney was "in possession of the salient papers in connection with the action."

67.     Under New York law, every court filing must contain an attorney's signature. That signature represents the attorney's certification that "to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of the paper or the contentions therein are not frivolous." 22 N.Y.C.R.R. § 130-1.01a(b).

68.     At the direction of the Asta Defendants, the Pressler Defendants prepared and filed these complaints, the allegations of which were based only on the "stream of data" or "media" provided by AT&T Wireless, and some information obtained by Defendants about events, such as bankruptcies, deaths, or payments to Pressler, that took place after the events supposedly giving rise to the complaint.

11

69.     Defendants rarely, if ever, reviewed each consumer's alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history before preparing and filing each complaint.

70.     Defendants did not have access to, and therefore never reviewed, any documents regarding each specific consumer's alleged account before filing suit.

71.     The Pressler attorney's verification that he or she was "in possession of the salient papers in connection with the action" was false.

72.     Some of the complaints stated that the consumer "entered into a Goods and/or Services Contract with the plaintiff," *i.e.*, Palisades Collection. These statements were false.

73.     Each of the complaints pleaded, *not* on information and belief, that "Plaintiff and/or AT&T Wireless has mailed monthly statements required by the agreement to defendant(s)." At the time the Pressler attorney verified that the statement was true, he or she did not know whether the statement was true.

74.     The "stream of data" or "media" provided by AT&T Wireless did not contain any information regarding monthly statements.

75.     Many complaints sought interest on the amount allegedly owed to Palisades Collection. Defendants did not have access to, and never reviewed, the alleged contracts before preparing and filing these complaints. Defendants therefore did not know whether any interest was authorized and, if so, what rate of interest applied.

76.     Defendants did not conduct a meaningful review of the consumer's alleged account before filing each complaint.

77.     Defendants knew at the time they filed each complaint that they lacked and would lack admissible evidence sufficient to prove the claims stated therein.

78.     Defendants knew at the time they filed each complaint that they did not have, and likely would not be able to obtain, the consumer's alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history during the course of the litigation.

79.     On information and belief, at the time they filed each complaint, Defendants did not intend to obtain the consumer's alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history during the course of the litigation.

80.     Defendants filed many lawsuits to collect alleged AT&T Wireless debts against consumers who in fact did not owe a penny to AT&T Wireless, and in some cases, had never opened AT&T Wireless accounts.

Defendants Used Fraudulent Affidavits To Obtain Default Judgments

81.     The Pressler Defendants retained process serving agencies in connection with the lawsuits to collect AT&T Wireless debts.

82.     The Pressler Defendants have a history of retaining process serving agencies that engage in sewer service.

83.     "Sewer service" refers to the practice of filing a fraudulent affidavit of service swearing that service has been made, when in fact service has not been made.

84.     Defendants knew that the process serving agencies the Pressler Defendants retained in connection with the lawsuits to collect AT&T Wireless debts commonly engaged in "sewer service."

85.     In 2008, the New York State Attorney General, on behalf of the Chief Administrative Judge of New York, sued Pressler and thirty-four other debt collection law firms

13

for filing false affidavits of service prepared by a process serving company that engaged in sewer service, American Legal Process, and seeking default judgments based on those fraudulent affidavits.

86.     On information and belief, Pressler entered a consent order under which it agreed to undertake procedures for vacating default judgments obtained in cases where American Legal Process was retained to serve process.

87.     On information and belief, the fraudulent practices for which the New York State Attorney General sued Pressler are not limited to American Legal Process, but are standard among the other process serving agencies retained by the Pressler Defendants.

88.     For example, in 2011, the New York City Department of Consumer Affairs ("DCA") initiated disciplinary proceedings against Interboro Process Serving Corp., the process serving agency that allegedly served Plaintiff Claude Millien on October 25, 2005, resulting in a consent order entered in December 2011.

89.     The DCA, in April 2010, refused to renew the license of process server Curtis Warren, who allegedly served Plaintiff Charlette Mayfield on June 20, 2006, because of numerous violations of the rules governing process server conduct, and based upon a finding that he failed to demonstrate the integrity and honesty necessary to hold a process server license.

90.     The DCA initiated disciplinary proceedings against Executive Attorney Services, Inc., the process serving agency that allegedly served Plaintiff Ebony Porter on November 16, 2005, resulting in a consent order entered in March 2012.

91.     The DCA initiated disciplinary proceedings against process server Jose Rojas, who allegedly served named Plaintiff Ebony Porter on November 16, 2005, resulting in a consent order entered in October 2012.

14

92.     Only *six percent* of consumers sued by Pressler in the New York City Civil Courts in 2007 appeared in court to defend themselves.

93.     Only *eight-and-a-half percent* of consumers sued in the New York City Civil Courts in 2007 regarding debts allegedly owed to Palisades Collection appeared in court to defend themselves.

94.     On information and belief, consumers sued by the Pressler Defendants at the direction of the Asta Defendants to recover alleged AT&T Wireless debts typically did not appear in court because they were never served with notice of the lawsuit.

95.     On information and belief, Defendants knowingly promoted the use of false affidavits of service through the Pressler Defendants' process serving agency payment practices.

96.     On information and belief, the Pressler Defendants paid the process serving agencies they retained to serve complaints only for completed service.

97.     On information and belief, in the lawsuits brought by the Pressler Defendants at the direction of the Asta Defendants to recover alleged AT&T Wireless debts, many of the affidavits of service prepared by the process serving agencies the Pressler Defendants retained were false.

98.     For example, some of the affidavits of service falsely attested that the process server effected "personal service" or "substitute service" on the defendant at an address where that person did not live at that time, or never lived.

99.     Other affidavits of service attested that the process server served the defendant at an accurate address but by "substitute service" delivered to a fictitious person, such as a non-existent relative.

15

100. Other affidavits of service reported that the process server effected "nail and mail" service on an address where the defendant never lived, or at the defendant's address but after falsely claiming to have unsuccessfully attempted service at times when the defendant would have been present to receive service.

101. On information and belief, Defendants knew that the affidavits of service were highly likely to be false.

102. The vast majority of individuals sued in these lawsuits did not appear in court.

103. When the individuals named in these lawsuits did not appear, Defendants routinely applied for default judgments against them.

104. Defendants routinely applied for default judgments against individuals even when Defendants had reason to believe that service was not properly effected.

105. More than eighty percent of consumer credit cases brought by debt buyers in the New York City Civil Courts in 2006 to 2008 resulted in default judgments for the debt buyers.

106. To obtain a default judgment in New York, a plaintiff must submit (a) proof of service, in the form an affidavit of service; and (b) proof of the "claim, the default, and the amount due by affidavit made by the party." CPLR § 3215(f).

107. Under New York law, debt buyers, like other plaintiffs in civil lawsuits, bear the burden of proof in legal actions. To prevail, the debt buyer must submit admissible evidence demonstrating that it is the rightful owner of the account and that the defendant actually owes the debt in the precise amount claimed. *See, e.g., Citibank v. Martin,* 807 N.Y.S.2d 284 (N.Y. Civ. Ct. 2005).

108. In debt collection actions, before obtaining a default judgment, the plaintiff also must submit an affidavit that additional notice has been mailed to the defendant by or

16

on behalf of plaintiff at least twenty days prior to the plaintiff's application for a default judgment. CPLR § 3215(g)(3).

109.    The plaintiff also must submit an affidavit "stating whether or not the defendant is in military service and showing necessary facts to support the affidavit." 50 U.S.C. App. § 521(b)(1).

110.    Where a claim is for a sum certain, as in debt collection suits, the Civil Court clerk "upon submission of the requisite proof, shall enter judgment for the amount demanded in the complaint . . . plus costs and interest." CPLR § 3215(a). No judge reviews the application for a default judgment.

111.    Each of Defendants' applications for default judgments was supported by an affidavit of service, an "Affidavit of Facts," and an "Affirmation of Non-Military Service."

112.    On information and belief, the vast majority of affidavits of service submitted by Defendants in support of their applications for default judgments were fraudulent.

113.    On information and belief, Defendants knew that the vast majority of affidavits of service supporting Defendants' applications for default judgment were fraudulent.

114.    The Affidavits of Facts that Defendants submitted in support of their applications for default judgment were signed by "Account Specialists" at Palisades Collection, on pain of perjury, and were notarized by individuals who, on information and belief, were other "Account Specialists."

115.    In these Affidavits of Facts, the Account Specialists swore that they had "personal knowledge of the facts & circumstances surrounding" the action, including that the defendant had entered an agreement with AT&T Wireless; that the defendant had provided AT&T Wireless with his or her date of birth, address, and social security number; that AT&T Wireless had

17

mailed a credit agreement to the defendant; that the defendant had utilized the credit account, made "minimal payments" to the account, defaulted on the account, received statements from AT&T Wireless, and did not object to the last statement.

116.   These Account Specialists did not have personal knowledge of any of those facts.

117.   These Account Specialists had no personal knowledge of AT&T Wireless's business practices.

118.   These Account Specialists did not have access to documents substantiating some or all of the facts contained in the affidavits at the time they swore to the affidavits.

119.   For some of these affidavits, these Account Specialists took no steps whatsoever even to verify that the information was in the stream of data.

120.   Because the Affidavits of Facts were not based on personal knowledge, they were inadmissible and insufficient to prove the claims on which Defendants sought default judgments.

121.   On information and belief, Defendants knew at the time they filed the Affidavits of Facts that the Affidavits of Facts were inadmissible and insufficient to prove the claims on which Defendants sought default judgments.

122.   Courts repeatedly have found that similar affidavits by Palisades Collection Account Specialists are inadmissible and cannot prove Palisades Collection's claims for consumer debts. *See, e.g., Palisades Collection v. Haque*, No. 64374/05, 2006 N.Y. Misc. LEXIS 4036 (N.Y. Civ. Ct. Apr. 13, 2006) (affidavits supposedly establishing that defendant owed Palisades Collection on AT&T Wireless debt inadmissible/insufficient); *Palisades Collection v. Gonzalez*, 809 N.Y.S.2d 482 (N.Y. Civ. Ct. 2005) (same); *Palisades Collection v. Kedik*, 890 N.Y.S.2d 230 (N.Y. App. Div. 2009) (affidavit Palisades Collection submitted to prove standing was inadmissible/insufficient); *Palisades Collection v. Kalal*, 324 Wis. 2d 180

18

(Wis. Ct. App. 2010) (affidavit of Palisades Collection "account specialist" insufficient to establish Chase credit card debt because she had no personal knowledge).

123. The Affirmations of Non-Military Service affirmed that a Pressler attorney accessed the Department of Defense Manpower Data Center over the internet and verified that the individual against whom judgment was sought was not in active military service.

124. The materials supporting Defendants' applications for default judgments in these cases were legally insufficient.

125. On information and belief, Defendants knew that, if the individuals named in these suits did appear in court to defend the actions, Defendants could not prove their claims against those individuals.

126. On information and belief, Defendants also knew that they would not be able to establish that the alleged AT&T Wireless accounts were properly assigned to Palisades Collection.

127. On the basis of Defendants' applications for default judgments, the court entered judgments in favor of Palisades Collection.

128. To obtain each fraudulent default judgment, each of the Defendants repeatedly used, and caused to be used, the mails and wires, or reasonably knew that the mails and wires would be used.

## Defendants Used and Continue To Use Improperly Obtained Default Judgments To Seize Consumers' Assets

129. Once a plaintiff obtains a default judgment against a person, it may enforce the judgment by, among other things, restraining and executing on the person's bank account, garnishing the person's wages, or seizing the person's personal property. *See, e.g.,*

19

CPLR §§ 5222, 5231, 5232. Plaintiffs' attorneys may institute these proceedings directly "as officers of the court," without any judicial intervention or scrutiny.

130.    After obtaining default judgments against consumers, Defendants routinely take actions to enforce the judgments, including by garnishing the consumers' wages and restraining and executing on their bank accounts.

131.    Defendants also attempt to collect the default judgments by providing information about the judgments to credit reporting agencies.

132.    Defendants take these enforcement and reporting actions with knowledge that the default judgments were obtained on the basis of insufficient proof.

133.    Defendants have taken these enforcement and reporting actions continuously to the present day.

134.    Judgments obtained in New York are enforceable for twenty years,

CPLR § 211(b), so Defendants will continue to execute on the improperly obtained defaults judgments for many years to come.

135.    Defendants take insufficient care in targeting individuals for enforcement or reporting of default judgments.

136.    Defendants often take action to enforce or report improperly obtained default judgments on the wrong individuals. For example, Defendants take action to enforce or report improperly obtained default judgments on individuals with names different than (though similar to) those against whom the judgments were obtained, and against individuals with social security numbers and dates of birth different than those against whom the judgments were obtained.

137.    To enforce each fraudulent default judgment, Defendants repeatedly use, and cause to be used, the mails and wires, or reasonably know that the mails and wires will be used.

Defendants Aggressively Fight Consumers Seeking To Vacate Improperly Obtained Default Judgments

138.    Many individuals against whom Defendants obtain default judgments in connection with AT&T Wireless debts only learned or will learn about the judgments against them after Defendants garnish their wages or restrain their bank accounts, or after the judgments appear on their credit histories.

139.    Some of these individuals have filed orders to show cause to vacate the default judgments.

140.    Virtually all such individuals are unrepresented by counsel.

141.    Defendants routinely oppose these individuals' orders to show cause, including by filing Affirmations in Opposition to Orders to Show Cause signed by Defendant Zipkin, despite knowledge that the default judgments were obtained on the basis of insufficient proof.

142.    When individuals do not succeed in having the court vacate the default judgments against them, Defendants routinely take action to collect on the improperly obtained default judgments.

143.    When individuals succeed in having the court vacate the default judgments against them, Defendants routinely fail to return garnished funds and seized assets in violation of court orders.

144.    Once individuals have had their judgments vacated, Defendants routinely serve on them notices to admit and interrogatories regarding the underlying accounts.

145.    Many of these notices to admit and interrogatories are signed by Defendants Zipkin or Stiller.

146.    If an individual fails to timely answer the interrogatories, the Pressler Defendants, including Defendants Zipkin and Stiller, routinely move to strike the individual's answer. If that motion is granted, the individual again is in default.

147.    The notices to admit and interrogatories are legally improper. Among other improprieties, the notices to admit improperly seek to elicit admissions of facts known or reasonably known to be in dispute, and the interrogatories are overbroad, unduly burdensome, and seek discovery on irrelevant topics.

148.    On information and belief, Defendants file these notices to admit and interrogatories for the purpose of harassing, abusing, and oppressing the consumers and to cause the consumers to default.

149.    If a consumer insists on proceeding to a trial against Palisades Collection, Defendants' practice is either to admit to the court that they are not prepared to proceed to trial, or to propose a stipulation of discontinuance to the consumers.

150.    Defendants do not go to trial in these cases because they know that they do not possess, and would not be able or willing to obtain, the information necessary to prove their claims.

151.    Defendants, including Defendants Zipkin and Stiller, routinely pressure consumers into entering settlements in cases in which Defendants know that they could not prove that the consumer owes a debt to Palisades Collection.

152.    Some of these settlement agreements require the consumers to pay money to Palisades Collection.

153.    Some of these settlement agreements contain releases designed to insulate Defendants from legal accountability for their unlawful actions.

154. To fight consumers seeking to vacate improperly obtained default judgments, Defendants repeatedly use, and cause to be used, the mails and wires, or reasonably know that the mails and wires will be used.

155. The consumers that Defendants sued over AT&T Wireless debts have suffered and will suffer substantial harm, including, but not limited to, costs incurred in connection with litigating the actions; costs associated with improper enforcement actions; monies extracted to satisfy improperly obtained default judgments; damage to credit history; and emotional and psychological harm.

## CLASS ACTION ALLEGATIONS

156. Named Plaintiffs bring this action, pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class consisting of:

> All individuals who have been or will be sued in New York City Civil Court by Pressler as counsel for Palisades Collection and/or Asta to collect alleged AT&T Wireless debts.

157. The class is so numerous that joinder of all class members in this action would be impracticable; upon information and belief, there are thousands of persons in the class.

158. In 2005, 2006, and 2007 alone, Pressler filed over nearly 60,000 cases in the New York City Civil Courts on behalf of Palisades Collection.

159. Defendants have acted and continue to act on grounds generally applicable to each member of the plaintiff class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

160. Class members present common questions of law and fact and these questions predominate over any individual questions.

161. The common questions of law include, but are not limited to: whether Defendants' practices in initiating legal proceedings. applying for default judgments. and collecting and attempting to collect on such judgments violate the FDCPA, RICO, the New York General Business Law, and the New York Judiciary Law.

162. The common questions of fact include. but are not limited to: whether Defendants filed suits against Plaintiffs without any verifiable basis for each claim, without undertaking a meaningful review of each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; whether Defendants falsely verified complaints; whether Defendants filed or caused to be filed false affidavits in support of applications for default judgments; and whether Defendants engaged in harassing, oppressive, and abusive litigation conduct.

163. The claims of the named Plaintiffs are typical of the claims of the class. Defendants have sued each of the named Plaintiffs based on falsely verified complaints and sought judgments on the basis of false affidavits, and each named Plaintiff has suffered from harassing and oppressive litigation conduct.

164. Named Plaintiffs will adequately and fairly protect the interests of all members of the proposed class because they have the requisite personal interest in the outcome of this litigation and have no interest antagonistic to any member of the proposed class.

165. Named Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG") and the law firm Hughes Hubbard & Reed LLP ("HHR"). Attorneys at both NYLAG and HHR are experienced in complex federal litigation and class action litigation.

166. A class action is the superior method for a fair and efficient adjudication of this matter in that Defendants have acted in a manner generally applicable to the class and a class

action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate as to the class as a whole.

167.    Moreover, it would be impracticable for potential plaintiffs, who are primarily low-income individuals with limited access to counsel, to obtain legal services on an individual basis for their claims. Hence their rights under the law may well be meaningless without certification of a class action seeking common redress.

## FACTS CONCERNING NAMED PLAINTIFFS

### *CHARLETTE MAYFIELD*

168.    Plaintiff Charlette Mayfield resides at 223 W. 145th Street, Apt. 1B, New York, New York. Ms. Mayfield lives with her husband, her two children, and her two sisters, one of whom is disabled, of whom she has legal custody. Ms. Mayfield works as an Assistant Horticulturist for the Battery Park City Authority, and also is pursuing a bachelor's degree at the College of New Rochelle.

169.    In early 2013, Ms. Mayfield's employer received an order directing it to withhold Ms. Mayfield's wages to satisfy a judgment on behalf of Palisades Collection. At around the same time, Ms. Mayfield was told by a mortgage broker that because of her negative credit history, which included the Palisades Collection judgment, she would be unable to obtain a mortgage to purchase a home for her family.

170.    These events were the first Ms. Mayfield learned of a judgment against her on behalf of Palisades Collection.

171.    Although Ms. Mayfield did not know this at the time, Defendants had filed a lawsuit against her on behalf of Palisades Collection on or around June 2, 2006.

172.    The same week Defendants sued Ms. Mayfield, they sued over 1200 other consumers in New York City.

173.    On information and belief, the attorney-verified complaint alleged "[u]pon information and belief" that Ms. Mayfield had entered a "Goods and/or Services Contract . . . with [Palisades Collection] and/or AT&T WIRELESS" on an unspecified date; that "upon information and belief" an agreement containing the terms and conditions governing the account, including the terms of payment, was mailed to Ms. Mayfield; and that, "upon information and belief," Ms. Mayfield owed a total of $1,831.87, including interest, on the account.  On information and belief, the complaint also pleaded, not on information and belief, that "Plaintiff and/or AT&T WIRELESS has mailed monthly statements required by the agreement to" Ms. Mayfield; and further alleged that Palisades Collection was "owner of" the account.

174.    On information and belief, the complaint stated: "This communication is from a debt collector."

175.    Defendant Franklin verified the complaint on May 10, 2006, stating on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which he believed to be true.  The verification also stated that Defendant Franklin was "in possession of the salient papers in connection with the action."

176.    On information and belief, the Pressler Defendants prepared this complaint based only on information contained in the "stream of data" or "media" provided by AT&T Wireless to the Asta Defendants, allegedly concerning Ms. Mayfield's purported account.

177.    On information and belief, Defendant Franklin did not review Ms. Mayfield's alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history before verifying the complaint.

178. On information and belief, Defendant Franklin did not have access to those alleged documents at the time he verified the complaint.

179. On information and belief, Defendant Franklin's verification that he was "in possession of the salient papers in connection with the action" was false.

180. On information and belief, at the time Defendant Franklin verified that AT&T Wireless mailed monthly statements to Ms. Mayfield, he did not know and could not have known whether the statement was true.

181. On information and belief, Defendant Franklin did not review the alleged contract specifying the rate of interest before verifying the complaint's claim for interest on Ms. Mayfield's alleged account. Accordingly, Defendant Franklin did not know if the interest was expressly authorized by the alleged contract.

182. On information and belief, Defendants did not conduct a meaningful review of Ms. Mayfield's alleged account before filing the complaint.

183. On information and belief, Defendants knew at the time they filed the complaint that they did not have, and likely would not be able to obtain, the alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history connected with Ms. Mayfield's alleged account during the course of the litigation.

184. On information and belief, Defendants knew at the time they filed the complaint that they lacked and would lack admissible evidence sufficient to prove the claims stated therein.

185. In fact, Ms. Mayfield never opened an AT&T Wireless account.

186. Defendants retained a process server named Curtis Warren to serve the summons and complaint on Ms. Mayfield.

27

187.    On information and belief, Defendants' arrangement with Mr. Warren was that Defendants would pay only for completed service of process.

188.    On June 29, 2006, Mr. Warren swore before a notary that on June 20, 2006, he served the Summons and Verified Complaint on Ms. Mayfield by delivering a copy of the documents to a "James Mayfield," a "resident/relative," at 863 Rev. James Polite Ave., Apt 2A, Bronx, New York.

189.    Mr. Warren attested that "James Mayfield" was a "person of suitable age and discretion," and indicated that he was a male with brown skin and black hair, approximately 36-50 years old. He stated that "James Mayfield['s]" height was over six feet and his weight was 161-200 pounds, and that "James Mayfield" had a mustache.

190.    Mr. Warren further attested that "James Mayfield" confirmed that "[s]aid premises" was Ms. Mayfield's "dwelling house."

191.    Mr. Warren further attested that he asked "the person spoken to" if Ms. Mayfield was in active military service and "received a negative reply."

192.    Mr. Warren further attested that he mailed a copy of the Summons and Verified Complaint to Ms. Mayfield at 863 Rev. James Polite Ave., Apt. 2A, Bronx, New York.

193.    Although Ms. Mayfield did reside at 863 Rev James Polite Ave. Apt. 2A, Bronx, New York at the time, she is not related to and does not know anyone named James Mayfield. No one of that name resided with her, nor did any other adult male fitting the physical description provided by Mr. Warren. At that time, Ms. Mayfield resided only with her young child.

194.    Ms. Mayfield did not receive any papers in the mail from Mr. Warren, Palisades Collection, or Pressler.

28

195. In fact, Ms. Mayfield was never served with process by any method.

196. On or around June 2, 2006, Defendants filed or caused to be filed Mr. Warren's fraudulent affidavit of service with the court.

197. On information and belief, Defendants knew that the affidavit of service was highly likely to be false.

198. In December 2006, Defendants sought a default judgment against Ms. Mayfield.

199. The application for a default judgment was signed by Defendant Franklin on December 14, 2006.

200. The application stated that Defendant Franklin mailed a copy of the summons to Ms. Mayfield at 863 Rev. James Polite Ave., Apt. 2A, on August 2, 2006.

201. In support of their application for a default judgment, Defendants submitted the fraudulent affidavit of service. They also submitted an "Affidavit of Facts" and an "Affirmation of Non-Military Service."

202. On information and belief, the Affidavit of Facts was signed by an "Account Specialist" at Palisades Collection, on pain of perjury, and was notarized.

203. On information and belief, in the Affidavit of Facts, the "Account Specialist" swore that she had "personal knowledge of the facts & circumstances surrounding this action."

204. On information and belief, the "Account Specialist" swore that Ms. Mayfield entered into an agreement with AT&T Wireless; that Ms. Mayfield had provided AT&T Wireless with her date of birth, address, and social security number; that AT&T Wireless mailed a credit agreement to Ms. Mayfield "at [Ms. Mayfield's] request"; that Ms. Mayfield utilized the credit account, "made minimal payments on behalf of the account," defaulted on the account,

29

and received statements from AT&T Wireless; and that Ms. Mayfield did not object to the last statement AT&T Wireless mailed to her.

205.   On information and belief, the "Account Specialist" did not have personal knowledge of any of those facts.

206.   On information and belief, the "Account Specialist" had no personal knowledge of AT&T Wireless's business practices.

207.   On information and belief, the "Account Specialist" did not have access to documents substantiating some or all of the facts contained in the affidavit at the time she swore to the affidavit.

208.   The Affidavit of Facts was inadmissible and insufficient to prove the claim against Ms. Mayfield on which Defendants sought a default judgment.

209.   On information and belief, in the Affirmation of Non-Military Service, Defendant Franklin affirmed that he conducted an investigation with the Department of Defense Manpower Data Center, which showed that Ms. Mayfield was not in the military, and attached a record of an inquiry made over the Internet.

210.   On January 22, 2007, the court entered a default judgment against Ms. Mayfield, in reliance on the fraudulent affidavit of service, the fraudulent Affidavit of Facts, and the Affirmation of Non-Military Service.

211.   Ms. Mayfield never knew of this judgment until early 2013.

212.   In May 2013, Ms. Mayfield, acting *pro se*, filed an order to show cause seeking to vacate the default judgment on the ground that she was never served.  Ms. Mayfield served the order to show cause on Pressler Defendants by certified mail.

213.    On May 16, 2013, Ms. Mayfield appeared *pro se* on the order to show cause. An attorney for Pressler claimed that Pressler had not received service of the order to show cause. Ms. Mayfield withdrew her order to show cause and refiled it the same day, again serving Pressler Defendants by certified mail.

214.    Defendants opposed the order to show cause. Their Affirmation in Opposition was signed by Defendant Zipkin on May 28, 2013. The accompanying Affirmation of Service by Mail stated that the Affirmation was mailed to Ms. Mayfield on May 28, 2013.

215.    The Affirmation in Opposition stated that Defendant Zipkin was "fully familiar with all the facts and circumstances of this action."

216.    The Affirmation in Opposition re-attached the fraudulent affidavit of service and stated that Ms. Mayfield's denial of having been served was insufficient.

217.    The Affirmation in Opposition also attached notices Defendant Zipkin claimed were mailed to Ms. Mayfield at the service address on February 1, 2007, August 13, 2008, April 7, 2010, and November 25, 2011.

218.    Ms. Mayfield never received any of these notices.

219.    On information and belief, Defendant Zipkin did not review Ms. Mayfield's alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history before signing the Affirmation in Opposition.

220.    On information and belief, Defendant Zipkin did not have access to those documents at the time he signed the Affirmation in Opposition.

221.    The court vacated the judgment on May 30, 2013.

222.    On June 4, 2013, Defendant Stiller, on behalf of Pressler, served Ms. Mayfield with Interrogatories and Notices to Admit Truth of Facts, seeking admissions from Ms. Mayfield that she applied for an account with AT&T Wireless, was provided services, utilized the account, received statements on the account, promised to pay the charges on the account, did not contest the charges, defaulted on the account, and agreed that the amount sought was accurate.

223.    The Interrogatories and Notices to Admit Truth of Facts were improper and had the effect of harassing, oppressing, and abusing Ms. Mayfield.

224.    With the assistance of the New York Legal Assistance Group, Ms. Mayfield responded to the Interrogatories and Notices to Admit Truth of Facts on July 2, 2013.

225.    On August 1, 2013, Defendant Stiller, on behalf of Pressler, served Ms. Mayfield with Supplemental Interrogatories. The Supplemental Interrogatories attached copies of documents purporting to be "account statements" associated with the AT&T Wireless account that was the subject of the suit, but Ms. Mayfield did not recognize the account.

226.    The Supplemental Interrogatories were improper and had the effect of harassing, oppressing, and abusing Ms. Mayfield.

227.    With the assistance of the New York Legal Assistance Group, Ms. Mayfield responded to the Supplemental Interrogatories.

228.    Ms. Mayfield appeared for trial on September 17, 2013. Pressler admitted to the court that Palisades Collection was not prepared to proceed to trial. The court dismissed the case against Ms. Mayfield with prejudice.

229.    To have the lawsuit dismissed, Ms. Mayfield appeared in court on at least three occasions over the course of five months. She also had to go to the courthouse to file documents.

32

230.    Ms. Mayfield had to miss work on these occasions, requiring her to use valuable personal time that was no longer available to deal with personal emergencies.

231.    The lawsuit contributed to Ms. Mayfield's ineligibility to obtain a loan to purchase a home for her family.

232.    Ms. Mayfield has also suffered stress and emotional distress because of the lawsuit.

*CLAUDE MILLIEN*

233.    Plaintiff Claude Millien resides at 912 E. 178th St., Bronx, New York. He works as a driver for Ben's Auto Parts, a company that sells automobile parts.

234.    In approximately March 2013, Mr. Millien noticed that his employer was garnishing his wages, and learned that it was to satisfy a judgment on behalf of Palisades Collection. This was the first Mr. Millien learned of such a judgment.

235.    Although Mr. Millien did not know this at the time, Defendants had filed a lawsuit against him on behalf of Palisades Collection on or around October 5, 2005.

236.    The same week that Defendants sued Mr. Millien, they sued almost 600 other consumers in New York City.

237.    The attorney-verified complaint alleged "[u]pon information and belief" that Mr. Millien had entered "a Goods and/or Services Contract . . . with the plaintiff [*i.e.* Palisades Collection]" on an unspecified date; that "upon information and belief" an agreement containing the terms and conditions governing the account, including the terms of payment, was mailed to Mr. Millien; and that, "upon information and belief," Mr. Millien owed \$3,192.58 on the account. The complaint also pleaded, *not* on information and belief, that "Plaintiff and/or AT&T

WIRELESS has mailed monthly statements required by the agreement to" Mr. Millien. The complaint further alleged that Palisades Collection was "owner of" the account.

238.    The complaint stated: "This communication is from a debt collector."

239.    Defendant Wang verified the complaint on August 13, 2005, stating on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which he believed to be true. The verification also stated that Defendant Wang was "in possession of the salient papers in connection with the action."

240.    On information and belief, the Pressler Defendants prepared this complaint based only on the information contained in the "stream of data" or "media" provided by AT&T Wireless to the Asta Defendants allegedly concerning Mr. Millien's purported account.

241.    On information and belief, Defendant Wang did not review Mr. Millien's alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history before verifying the complaint.

242.    On information and belief, Defendant Wang did not have access to those alleged documents at the time he verified the complaint.

243.    On information and belief, Defendant Wang's verification that he was "in possession of the salient papers in connection with the action" was false.

244.    On information and belief, at the time Defendant Wang verified that AT&T Wireless mailed monthly statements to Mr. Millien, he did not know whether the statement was true.

245.    On information and belief, Defendants did not conduct a meaningful review of Mr. Millien's alleged account before filing the complaint.

246. On information and belief, Defendants knew at the time they filed the complaint that they did not have, and likely would not be able to obtain, the alleged account agreement, account application, signed contract, original billing statements, payment records, or dispute history connected with Mr. Millien's alleged account during the course of the litigation.

247. On information and belief, Defendants knew at the time they filed the complaint that they lacked admissible evidence sufficient to prove the claims stated therein.

248. In fact, Mr. Millien never opened an AT&T Wireless account.

249. Defendants retained a process service company called Interboro Attorney Service Corporation to serve the summons and complaint on Mr. Millien.

250. On information and belief, Defendants' arrangement with Interboro Attorney Service Corporation was that Defendants would pay only for completed service of process.

251. On October 25, 2005, Stephen Steinberg, a process server for Interboro Attorney Service Corporation, swore before a notary that he served the Summons and Verified Complaint on Mr. Millien by nail and mail service by affixing a copy to the door of 3818 Barnes Ave., Apt. 2F, Bronx, New York, on October 13, 2005, and that on October 17, 2005, he mailed a copy of those documents to that address. Mr. Steinberg further attested that he had attempted on four previous occasions to serve Mr. Millien at that address.

252. Mr. Steinberg further attested that he confirmed with a "neighbor," "Mr. Jo," that Mr. Millien was not in active military service.

253. Based on his normal work schedule, Mr. Millien likely would have been at his apartment on three out of the five occasions Mr. Steinberg purported to have attempted service. Moreover, Mr. Millien's girlfriend, who resided with him and stayed at home to care for her children, likely would have been present on all five occasions.

254.    Mr. Millien did not know any neighbor (or anyone else) named "Mr. Jo," so such person. if he existed, would not have been able to identify Mr. Millien's military status.

255.    Mr. Millien never received any copy of the summons and complaint either affixed to his door or by mail.

256.    In fact. Mr. Millien was never served with process by any method.

257.    On or around October 27, 2005, the Pressler Defendants filed the affidavit of service with the court, or caused it to be filed with the court.

258.    On information and belief, Defendants knew that the affidavit of service was highly likely to be false.

259.    In October 2006, Defendants sought a default judgment against Mr. Millien.

260.    The application for a default judgment was signed by Defendant Franklin on October 3, 2006.

261.    The application stated that Defendant Franklin mailed a copy of the summons and complaint to Mr. Millien at 3818 Barnes Ave., Bronx, New York on November 4, 2005.

262.    In support of their application for a default judgment, Defendants submitted the fraudulent affidavit of service. They also submitted an "Affidavit of Facts" and an "Affirmation of Non-Military Service."

263.    On information and belief, the Affidavit of Facts was signed by an "Account Specialist" at Palisades Collection, on pain of perjury.

264.    On information and belief, in the Affidavit of Facts, the Account Specialist swore that she had "personal knowledge of the facts & circumstances surrounding this action."

265.    On information and belief, the Account Specialist swore that Mr. Millien entered into an agreement with AT&T Wireless; Mr. Millien had provided AT&T Wireless with his date

of birth, address, and social security number; that AT&T Wireless mailed a credit agreement to Mr. Millien "at [Mr. Millien's] request"; that Mr. Millien utilized the credit account, "made minimal payments on behalf of the account," defaulted on the account, and received statements from AT&T Wireless; and that Mr. Millien did not object to the last statement AT&T Wireless mailed to him.

266.    On information and belief, the Account Specialist did not have personal knowledge of any of those facts.

267.    On information and belief, the Account Specialist had no personal knowledge of AT&T Wireless's business practices.

268.    On information and belief, the Account Specialist did not have access to documents substantiating some or all of the facts contained in the affidavit at the time she swore to the affidavit.

269.    On information and belief, the Affidavit of Facts was inadmissible and insufficient to prove the claim against Mr. Millien on which Defendants sought a default judgment.

270.    On information and belief, in the Affirmation of Non-Military Service, Defendant Franklin affirmed that he conducted an investigation with the Department of Defense Manpower Data Center, which showed that Mr. Millien was not in the military, and attached a record of an inquiry made over the internet on that date.

271.    On November 3, 2006, the court entered a default judgment against Mr. Millien, in reliance on the fraudulent affidavit of service, fraudulent Affidavit of Facts, and Affirmation of Non-Military Service.

272. On March 25, 2013, Defendants caused a City Marshal to mail Mr. Millien's employer an execution notice on the judgment.

273. Mr. Millien never knew of this judgment until his employer began garnishing his wages pursuant to this notice.

274. Mr. Millien's employer garnished approximately $200 of Mr. Millien's wages over the course of several weeks.

275. After learning of the garnishment, Mr. Millien contacted Pressler. He told Pressler that the debt was not his and asked that Pressler stop the garnishment. A Pressler representative told him there was no way Mr. Millien could stop the garnishment and that Pressler would proceed with it.

276. On March 29, 2013, Pressler mailed Mr. Millien a letter stating that they refused to stop the garnishment and would proceed with execution.

277. On April 1, 2013, Mr. Millien, acting *pro se*, filed an order to show cause seeking to vacate the default judgment. In support of his order to show cause and in his proposed Answer, Mr. Millien stated that he had not been served and denied that he owed the debt claimed.

278. Defendants opposed the order to show cause. Their Affirmation in Opposition was signed by Defendant Zipkin on April 9, 2013. The accompanying Affirmation of Service by Mail stated that the affirmation was mailed to Mr. Millien on April 9, 2013.

279. The Affirmation in Opposition stated that Defendant Zipkin was "fully familiar with all the facts and circumstances of this action."

280. The Affirmation in Opposition re-attached the fraudulent affidavit of service.

38

281.    The Affirmation in Opposition attached notices Defendant Zipkin claimed were mailed to Mr. Millien at the service address on November 14, 2006; February 13, 2008; September 18, 2008; April 20, 2010; September 16, 2011; and September 24, 2012.

282.    Mr. Millien never received any of these notices.

283.    On information and belief, Defendant Zipkin did not review Mr. Millien's alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history before signing the Affirmation in Opposition.

284.    On information and belief, Defendant Zipkin did not have access to those alleged documents at the time he signed the Affirmation in Opposition.

285.    The court vacated the judgment on April 17, 2013.

286.    On April 22, 2013, Defendant Stiller served Mr. Millien with Interrogatories and Notices to Admit Truth of Facts, seeking admissions from Mr. Millien that he applied for an account with AT&T Wireless, was provided services, utilized the account, received statements on the account, promised to pay the charges on the account, did not contest the charges, defaulted on the account, and agreed that the amount sought was accurate.

287.    The Interrogatories and Notices to Admit Truth of Facts were improper and had the effect of harassing, oppressing, and abusing Mr. Millien.

288.    Mr. Millien did not understand how to answer the Interrogatories and Notices to Admit Truth of Facts, or that he was required to do so.

289.    On May 31, 2013, Defendant Stiller mailed Mr. Millien copies of documents purporting to be "account statements" associated with the AT&T Wireless account that was the subject of the suit, but Mr. Millien did not recognize the account.

39

290.    On July 3, 2013, Defendant Stiller, on behalf of Pressler, moved to strike Mr. Millien's Answer on the ground that he had not responded to the Interrogatories. If granted, the effect of the motion would have been to put Mr. Millien in default again.

291.    On July 26, 2013, the court conditionally granted Defendants' motion but gave Mr. Millien twenty additional days to respond to the Notices to Admit Truth of Facts and Interrogatories. With the assistance of the New York Legal Assistance Group, Mr. Millien timely filed responses.

292.    Mr. Millien appeared for trial on September 17, 2013. Pressler admitted to the court that Palisades Collection was not prepared to proceed to trial. The court dismissed the case against Mr. Millien with prejudice.

293.    Although the judgment against Mr. Millien was vacated on April 17, 2013, Defendants have not, as of the date of this Complaint, returned the approximately $200 they garnished from Mr. Millien's paycheck.

294.    Mr. Millien has been without the use of his garnished funds for over one year.

295.    To have this improper lawsuit dismissed, Mr. Millien was required to appear in court on at least four occasions over the course of six months. He also had to go to the courthouse to seek legal assistance and file documents. He missed a full day of work on each occasion, requiring him to use valuable sick days that were no longer available in case of a medical emergency.

296.    Mr. Millien also suffered stress and emotional distress because of the lawsuits.

*EBONY PORTER*

297.    Plaintiff Ebony Porter resides at 1727 Walton Ave., Apt. 53A, Bronx, New York. She works in the field of personal care at Five Star Nursing Home in Yonkers, New York.

40

298.    In approximately June or July 2013. Ms. Porter noticed that her employer was garnishing her wages, and after making repeated inquiries, learned that it was to satisfy a judgment from Palisades Collection. This was the first Ms. Porter learned of such a judgment.

299.    Although Ms. Porter did not know this at the time, Defendants had filed a lawsuit against her on behalf of Palisades Collection on or around November 7, 2005.

300.    The same week that Defendants sued Ms. Porter, they sued nearly 600 other consumers in New York City.

301.    On information and belief, the attorney-verified complaint alleged "[u]pon information and belief" that Ms. Porter had entered "a Goods and/or Services Contract . . . with plaintiff [*i.e.* Palisades Collection]" on an unspecified date; that "upon information and belief" an agreement containing the terms and conditions governing the account, including the terms of payment, was mailed to Ms. Porter; and that, "upon information and belief," Ms. Porter owed a total of $7,193.12, including interest, on the account.  On information and belief, the complaint also pleaded, *not* on information and belief, that "Plaintiff and/or AT&T WIRELESS has mailed monthly statements required by the agreement to" Ms. Porter, and that Palisades Collection was "owner of" the account.

302.    On information and belief, the complaint stated: "This communication is from a debt collector."

303.    On information and belief, an attorney for Pressler verified the complaint, stating on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which he believed to be true.  The verification also stated that the attorney was "in possession of the salient papers in connection with the action."

41

304. On information and belief, the Pressler Defendants prepared this complaint based only on the information contained in the "stream of data" or "media" provided by AT&T Wireless to the Asta Defendants allegedly concerning Ms. Porter's purported account.

305. On information and belief, the Pressler attorney did not review Ms. Porter's alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history before verifying the complaint.

306. On information and belief, the Pressler attorney did not have access to those alleged documents at the time he verified the complaint.

307. On information and belief, the Pressler attorney's verification that he was "in possession of the salient papers in connection with the action" was false.

308. On information and belief, at the time the Pressler attorney verified that AT&T Wireless mailed monthly statements to Ms. Porter, he did not know whether the statement was true.

309. On information and belief, Defendants did not conduct a meaningful review of Ms. Porter's alleged account before filing the complaint.

310. On information and belief, Defendants knew at the time they filed the complaint that they did not have, and likely would not be able to obtain, the alleged account agreement, account terms and conditions, account application, signed contract, original billing statements, payment records, or dispute history connected with Ms. Porter's alleged account during the course of the litigation.

311. On information and belief, Defendants knew at the time they filed the complaint that they lacked admissible evidence sufficient to prove the claims stated therein.

312.    In fact, although Ms. Porter at one time had opened an AT&T Wireless account, she did not owe any money on that account.

313.    Defendants retained a process service company called Executive Attorney Service to serve the summons and complaint on Ms. Porter.

314.    On information and belief. Defendants' arrangement with Executive Attorney Service was that Defendants would pay only for completed service of process.

315.    On November 17, 2005, Jose Rojas. a process server for Executive Attorney Service, swore before a notary that on November 16, 2005, he served the Summons and Verified Complaint on Ebony Porter by delivering a copy of the documents to a "Rhondq [sic] Porter," at 1550 Townsend Ave., Apt. 6E, Bronx, New York.

316.    Mr. Rojas attested that "Rhondq Porter" was a "person of suitable age and discretion" and indicated that she was a female with black skin and brown hair, approximately 46 years old. He estimated her height to be 5'4" and her weight to be between 120 and 130 lbs.

317.    Mr. Rojas further attested that when he asked "Rhondq Porter" "whether said premises was the Recipient's place of residence," her answer was "affirmative."

318.    Mr. Rojas further attested that he asked "the person spoken to" if Ebony Porter was in active military service and "received a negative reply."

319.    Mr. Rojas further attested that he mailed a copy of the Summons and Verified Complaint to Ebony Porter at the same address, 1550 Townsend Ave., Apt. 6E, Bronx, New York, on November 17, 2005.

320.    Ms. Porter did not then reside, nor has she ever resided, at 1550 Townsend Ave., Apt. 6E. Bronx, New York.

321.    Ms. Porter does not know anyone named "Rhondq Porter," or "Rhonda Porter."

322.    In fact, Ms. Porter was never served with process by any method.

323.    On or around November 21, 2005, the Pressler Defendants filed the November 17, 2005 affidavit with the court, or caused it to be filed with the court.

324.    On information and belief, Defendants knew that the affidavit of service was highly likely to be false.

325.    In August 2006, Defendants sought a default judgment against Ms. Porter.

326.    The application for a default judgment was signed by Defendant Franklin on August 23, 2006.

327.    The application stated that Defendant Franklin mailed a copy of the summons and complaint to Ms. Porter at 1550 Townsend Ave., Apt. 6E, Bronx, New York, on November 29, 2005.

328.    In support of their application for a default judgment, Defendants submitted the fraudulent affidavit of service. They also submitted an "Affidavit of Facts" and an "Affirmation of Non-Military Service."

329.    The Affidavit of Facts was signed by Minerva Garcia, an "Account Specialist" at Palisades Collection, on pain of perjury, and was notarized on April 6, 2006.

330.    In the Affidavit of Facts, Ms. Garcia swore that she had "personal knowledge of the facts & circumstances surrounding this action."

331.    Specifically, Ms. Garcia swore that Ms. Porter entered into an agreement with AT&T Wireless; that Ms. Porter had provided AT&T Wireless with her date of birth, address, and social security number; that AT&T Wireless mailed a credit agreement to Ms. Porter "at [Ms. Porter's] request"; that Ms. Porter utilized the credit account, "made minimal payments on behalf of the account," defaulted on the account, and received statements from AT&T Wireless;

44

that AT&T Wireless mailed the last statement on August 7, 2001; and that Ms. Porter did not object to that statement.

332. On information and belief, Ms. Garcia did not have personal knowledge of any of the facts contained in the Affidavit of Facts.

333. On information and belief, Ms. Garcia had no personal knowledge of AT&T Wireless's business practices.

334. On information and belief, Ms. Garcia did not have access to documents substantiating some or all of the facts contained in the Affidavit of Facts at the time she swore to the Affidavit of Facts.

335. On information and belief, the Affidavit of Facts was inadmissible and insufficient to prove the claim against Ms. Porter on which Defendants sought a default judgment.

336. The Affirmation of Non-Military Service was signed by Defendant Franklin on August 23, 2006. Defendant Franklin affirmed that he conducted an investigation with the Department of Defense Manpower Data Center on August 22, 2006, which showed that Ms. Porter was not in the military, and attached a record of an inquiry made over the internet on that date.

337. On September 26, 2006, the court entered a default judgment against Ms. Porter, in reliance on the fraudulent affidavit of service, fraudulent Affidavit of Facts, and Affirmation of Non-Military Service.

338. Ms. Porter never knew of this judgment until her wages were garnished in 2013.

339. On November 4, 2013, Ms. Porter, acting pro se, filed an order to show cause seeking to vacate the default judgment primarily on the ground that she was not properly served

with the Summons and Complaint. Ms. Porter served the order to show cause on Pressler Defendants by certified mail. Meanwhile, Ms. Porter's wages continued to be garnished.

340. On November 14, 2013, Ms. Porter appeared *pro se* on the order to show cause. An attorney for Pressler claimed that Pressler had not received service of the order to show cause, and requested an adjournment, which the court granted.

341. Defendants subsequently opposed the order to show cause. Attached to their Opposition were copies of documents purporting to be "account statements" associated with the AT&T Wireless account that was the subject of the suit, but Ms. Porter did not recognize the account.

342. On December 20, 2014, Ms. Porter appeared *pro se* on the order to show cause. The attorney appearing for Pressler claimed he was not familiar with the case and requested a further adjournment, which the court granted.

343. On January 31, 2014, Ms. Porter again appeared *pro se* on the order to show cause. After speaking to the judge, Ms. Porter met with a volunteer attorney from the New York Legal Assistance Group. With the assistance of the attorney, Ms. Porter presented the court with a driver's license demonstrating that, the day before service supposedly was effected, she resided at an address other than the service address. Pressler continued to oppose Ms. Porter's motion. The court granted an adjournment so that Ms. Porter could file a reply responding to Pressler's opposition.

344. On February 20, 2014, Ms. Porter again appeared on the order to show cause. She submitted a reply affidavit she prepared with the help of volunteer attorneys at the Civil Legal Advice and Resource Office (CLARO), which provides limited legal advice to low-

46

income New Yorkers being sued by debt collectors. The court took Ms. Porter's motion to vacate on submission.

345. On February 24, 2014, the court issued a written decision granting Ms. Porter's motion to vacate conditional on the result of a traverse hearing---that is, a hearing to determine whether service had been made.

346. On April 3, 2014, Ms. Porter appeared for the traverse hearing. An attorney for Pressler appeared and admitted to the court that Palisades Collection was not prepared to proceed with the hearing. The court dismissed the action against Ms. Porter and directed that all garnished funds be returned to Ms. Porter "forthwith."

347. As of the date of this Complaint, Defendants have not returned the approximately $1,200 they garnished from Ms. Porter's paychecks.

348. Ms. Porter has been without the use of her garnished wages for between four and ten months as of the date of this Complaint.

349. To have Defendants' improper lawsuit dismissed, Ms. Porter was required to appear in court on at least five occasions over the course of six months. She also had to go to the courthouse to seek legal assistance and file documents. As a result, Ms. Porter's work schedule was disrupted.

350. Ms. Porter also suffered stress and emotional distress because of the lawsuits.

## FIRST CAUSE OF ACTION
(FDCPA, 15 U.S.C. § 1692)

351. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 350 above.

352. Defendants are "debt collectors" within the meaning of the FDCPA. 15 U.S.C. § 1692a(6).

353. The FDCPA prohibits "debt collectors" from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt," including making a false representation of "the character, amount, or legal status of any debt," and using deceptive means "to collect or attempt or collect any debt," 15 U.S.C. § 1692e; engaging in "any conduct the natural consequence of which is to harass, oppress, or abuse any person," 15 U.S.C. § 1692d; and using "unfair or unconscionable means" to attempt to collect a debt, including attempting to collect amounts not "expressly authorized by the agreement" creating the debt. 15 U.S.C. § 1692f.

354. Defendants violated the FDCPA, 15 U.S.C. §§ 1692d, 1692e, and 1692f by making false and misleading representations, using deceptive means, and engaging in unfair and abusive practices. Defendants' violations include, but are not limited to:

        a. Commencing suits against Plaintiffs without undertaking a meaningful review of each claim;

        b. Commencing suits against Plaintiffs without any verifiable basis for each claim and without the ability or intent to obtain the documentation necessary to prove each claim;

        c. Falsely verifying complaints;

        d. Seeking amounts not expressly authorized by agreement;

        e. Filing or causing to be filed false affidavits of service;

        f. Filing false Affidavits of Facts in support of applications for default judgments;

        g. Filing false and deceptive affirmations in opposition to orders to show cause seeking to vacate these default judgments;

        h. Taking actions to execute judgments, including garnishment and bank account restraint, with insufficient care, on the wrong consumers, and on the basis of fraudulently obtained default judgments;

        i. Unlawfully retaining funds obtained through execution of judgments; and

        j. Engaging in harassing, oppressive, and abusive litigation conduct.

355.    As a direct and proximate result of Defendants' violations, Plaintiffs have sustained actual damages in an amount to be proved at trial and are also entitled to statutory damages, costs, and attorneys' fees.

## SECOND CAUSE OF ACTION
(Civil RICO, 18 U.S.C. § 1962(c))

356.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 355 above.

357.    Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

358.    Defendants are corporate entities and natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

### The Enterprise

359.    Asta, Stern, Asta John/Jane Does 1-20, Palisades Collection, Palisades Collection John/Jane Does 1-20, Pressler, Franklin, Wang, Zipkin, Stiller, and Pressler John/Jane Does 1-20 together form an association-in-fact and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). Each and every Defendant is associated with the Enterprise.

360.    The purpose of the Enterprise is to collect debts that Defendants cannot prove through fraudulently and deceptively filing and pursuing debt collection actions. This is accomplished by Asta and Palisades Collection, at the direction of Stern, buying debts for collection; the Pressler Defendants, at the direction of the Asta Defendants, commencing actions in the New York City Civil Court on behalf of Palisades Collection; and the Pressler Defendants, at the direction of the Asta Defendants, obtaining and enforcing default judgments against Plaintiffs and putative class members through fraudulent means.

361. The relationships among Defendants are longstanding and ongoing. The Asta Defendants began working with the Pressler Defendants in early 2005, if not before, and continue their relationship to this day.

362. For at least eight years the Enterprise has been engaged in, and continues to be engaged in, activities that affect interstate commerce. Defendants' unlawful enterprise in violation of RICO has been and remains longstanding, continuous, and open-ended.

363. Defendant Asta directed the purchase of consumer debts from AT&T Wireless that formed the basis of the Enterprise's fraudulent and deceptive debt collection actions. Asta also developed and oversees the "legal strategy" scheme pursuant to which the Pressler Defendants commenced those fraudulent and deceptive debt collection actions.

364. Defendant Palisades Collection owns the AT&T Wireless consumer debts that form the basis of Defendants' fraudulent and deceptive debt collection actions, and, at Asta's direction, commenced those actions by and through the Pressler Defendants. Palisades Collection employees, acting at Palisades Collection's and Asta's direction, also signed fraudulent Affidavits of Facts filed with the New York City Civil Court.

365. Defendant Stern, the President and Chief Executive Officer of Asta and Principal of Palisades Collection, orchestrated, supervised, and monitored the Enterprise's scheme to commence fraudulent and deceptive debt collection actions.

366. Defendant Pressler, at the direction of the Asta Defendants, litigates the fraudulent and deceptive debt collection actions. Pursuant to the Asta Defendants' retainer agreement with Pressler, Pressler was required keep the Asta Defendants apprised of the scheme's progress by providing the Asta Defendants with monthly reports. In addition, the Asta

Defendants were permitted to conduct audits of the Pressler Defendants' implementation of the Defendants' litigation strategy.

367.    Defendant Franklin, an attorney at Pressler at all relevant times, litigates the fraudulent and deceptive debt collection actions, including verifying fraudulent complaints and signing or affirming other fraudulent filings in New York City Civil Court.

368.    Defendant Wang, an attorney at Pressler at all relevant times, litigates the fraudulent and deceptive debt collection actions, including verifying fraudulent complaints and signing or affirming other fraudulent filings in New York City Civil Court.

369.    Defendant Zipkin, an attorney at Pressler at all relevant times, litigates the fraudulent and deceptive debt collection actions, including signing fraudulent Affirmations in Opposition to Orders to Show Cause and other fraudulent filings in New York City Civil Court.

370.    Defendant Stiller, an attorney at Pressler at all relevant times, litigates the fraudulent and deceptive debt collection actions, including signing fraudulent Affirmations in Opposition to Orders to Show Cause and other fraudulent filings in New York City Civil Court.

### Pattern of Racketeering Activity

371.    Defendants, individually and as part of the Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

372.    Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations. Each Defendant's participation was critical to the racketeering scheme. They enabled, conducted, and maintained the racketeering scheme by:

> a.  Filing deceptive complaints that falsely stated that Defendants were "in possession of the salient papers in connection with the action," when in fact they were not in possession of such papers;

51

b. Filing deceptive complaints that misrepresented that Defendants were in possession of, or could obtain, documentation evidencing that Plaintiffs and class members owe a debt, when in fact they did not possess and could not obtain such documentation;

c. Filing or causing to be filed fraudulent affidavits of service that falsely claimed that Plaintiffs and class members were served with a summons and complaint when in fact they were not;

d. Producing and filing, in support of applications for default judgments, fraudulent Affidavits of Facts that falsely claimed that Defendants had personal knowledge of the facts necessary to obtain a default judgment, when in fact they did not;

e. Filing or causing to be filed, in support of applications for default judgments, fraudulent affidavits of service that falsely claimed that Defendants had effected service of process on Plaintiffs and class members, when in fact they did not;

f. Filing false and deceptive affirmations in opposition to orders to show cause seeking to vacate these default judgments; and

g. Using fraudulently obtained default judgments to extract money from Plaintiffs and class members.

373. Specifically, Defendants have made fraudulent misrepresentations on the

following occasions:

a. On or around August 13, 2005 and May 10, 2006, Defendants falsely verified complaints stating that they were "in possession of the salient papers in connection with [each] action," when they were not;

b. On or around November 21, 2005, October 27, 2005 and June 2, 2006, Defendants filed or caused to be filed fraudulent affidavits of service with the Civil Court falsely stating that service had been made, when it was not;

c. In August 2006, October 2006, and December 2006, Defendants submitted the fraudulent affidavits of service with the Civil Court in support of their applications for default judgment;

d. On or around April 6, 2006, Defendants signed an Affidavit of Facts falsely claiming that Defendants had personal knowledge of the facts and circumstances surrounding the action, when in fact they did not.

e. In August 2006, October 2006, and December 2006, Defendants filed fraudulent Affidavits of Facts with the Civil Court falsely claiming that Defendants had personal knowledge of the facts and circumstances surrounding this action, when in fact they did not; and

f. In May 2013 and April 2013, Defendants filed fraudulent affirmations in opposition to orders to show cause falsely representing that they were "fully familiar with all the facts and circumstances of this action" when they were not, and attaching the fraudulent affidavits of service.

374. Defendants, acting individually and as part of the Enterprise, have used the mails

and wires and have caused the mails and wires to be used, or reasonably knew the mails and

wires would be used, in furtherance of their fraudulent scheme, specifically:

     a. On or about June 29, 2006, Defendants caused a process server to send a copy of the summons and complaint through the U.S. mail to Ms. Mayfield at 863 Rev. James Polite Ave.. Bronx, New York, according to the process server's affidavit dated June 29, 2006;

     b. On or about August 2, 2006, Defendant Franklin sent a copy of the summons and complaint through the U.S. mail to Ms. Mayfield at 863 Rev. James Polite Ave., Bronx, New York, according to Defendant Franklin's application for default judgment dated December 14, 2006;

     c. On or about February 1, 2007, August 13, 2008. April 7, 2010, and November 25, 2011, the Pressler Defendants sent Judgment Notices through the U.S. mail to Ms. Mayfield at 863 Rev. James Polite Ave., Apt. 2A, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on May 28, 2013;

     d. On or about May 28, 2013, Defendant Zipkin sent an Affirmation in Opposition to Ms. Mayfield's order to show cause through the U.S. mail to Ms. Mayfield at 223 West 145th Street, Apt. 1B, New York, New York;

     e. On or about June 4, 2013 the Pressler Defendants sent Interrogatories and Notices to Admit through the U.S. mail to Ms. Mayfield at 223 West 145th Street, Apt. 1B, New York, New York;

     f. On or about August 1, 2013, the Pressler Defendants sent Supplemental Interrogatories though the U.S. mail to Ms. Mayfield at 223 West 145th Street. Apt. 1B, New York, New York.

     g. On or about October 17, 2005, Defendants caused a process server to send a copy of the summons and complaint through the U.S. mail to Mr. Millien at 3818 Barnes Ave., Apt. 2F, Bronx, New York, according to the process server's affidavit dated October 25, 2005;

     h. On or about November 4, 2005, Defendant Franklin sent a copy of the summons and complaint through the U.S. mail to Mr. Millien at 3818 Barnes Ave. Apt, 2F, Bronx, New York, according to Defendant Franklin's application for a default judgment dated October 3, 2006;

i. On or about November 14, 2006, February 13, 2008, September 18, 2008, April 20, 2010, September 16, 2011, and September 24, 2012, the Pressler Defendants sent Judgment Notices through the U.S. mail to Mr. Millien at 3818 Barnes Ave Apt. 24, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on April 9, 2013;

j. On or about March 25, 2013, the Pressler Defendants caused a City Marshal to send a Notice of Garnishment through the U.S. mail to Mr. Millien's employer at Ben's Auto Parts Inc.. 3687 White Plains Road, Bronx, New York;

k. On or about March 29, 2013, the Pressler Defendants mailed a letter stating that they refused to stop garnishment through the U.S. mail to Mr. Millien at 3818 Barnes Ave., Apt. 2F, Bronx, New York.

l. On or about April 9, 2013, Defendant Zipkin sent an Affirmation in Opposition to Mr. Millien's order to show cause to vacate the judgment through the U.S. mail to Mr. Millien at 3818 Barnes Ave., Apt. 2F, Bronx, New York;

m. On or about April 22, 2013, the Pressler Defendants sent Interrogatories and Notices to Admit Truth of Facts through the U.S. mail to Mr. Millien at 3818 Barnes Ave., Apt. 2F, Bronx, New York;

n. On or about May 31, 2013, the Pressler Defendants sent a letter attaching purported "Account Statements" to Mr. Millien at 3818 Barnes Ave., Apt. 2F, Bronx, New York;

o. Defendant Franklin used the interstate wires to access the Department of Defense Manpower Data on August 22, 2006, according to his Affirmation dated August 23, 2006;

p. On or about November 17, 2005, Defendants caused a process server to send a copy of the summons and complaint through the U.S. mail to Ms. Porter at 1550 Townsend Ave., Apt. 6E, Bronx, New York, according to the process server's affidavit dated November 17, 2005;

q. On or about November 29, 2005, Defendant Franklin sent a copy of the summons and complaint through the U.S. mail to Ms. Porter at 1550 Townsend Ave., Apt. 6E, Bronx, New York, according to Defendant Franklin's application for a default judgment dated August 23, 2006;

r. Defendants have used the mails and wires on thousands of other occasions that Plaintiffs cannot identify at this time but are known to Defendants.

375.   Defendants have used the mails and wires in connection with every default

judgment that they have fraudulently obtained, and each use of the mails and wires has furthered

54

the fraudulent scheme and enabled Defendants to take money and property from Plaintiffs and putative class members by means of false pretenses and representations.

376. Each and every Defendant has specific knowledge that the mails and wires are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used because the CPLR and other governing statutes make use of the mails and wires mandatory. Indeed, no default judgment can be obtained without approximately half a dozen uses of the mail and wires, and frequently more.

377. Each of the thousands of uses of the mails and wires in connection with Defendants' scheme to defraud, spanning a period of no fewer than eight years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. § 1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

378. In connection with Defendants' scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 et seq., and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated over and over again.

### *Relationship of Pattern of Racketeering Activity to Enterprise*

379. The goal of Defendants' Enterprise is to collect debts that Defendants cannot prove through fraudulently and deceptively filing and pursuing debt collection actions, fraudulently obtaining default judgments in those actions, and using those judgments to extract money and property from Plaintiffs and putative class members.

380.    The pattern of racketeering activity described above is integral to Defendants'
scheme. Without engaging in mail and wire fraud, Defendants would be unable to obtain the
default judgments they seek.

381.    Each Defendant, individually and as a member of the Enterprise, has conducted or
participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of
racketeering activity described above. Accordingly, each Defendant has violated 18 U.S.C.
§ 1962(c).

382.    As a direct and proximate result of the RICO violations described in this
Complaint, Plaintiffs and putative class members have suffered substantial injuries. Defendants'
actions in violation of 18 U.S.C. § 1962(c) have caused Plaintiffs and putative class members to
have default judgments entered against them which have then been used to extract money from
them by restraining and executing on their bank accounts, garnishing their wages, damaging their
credit ratings, causing them to incur costs and lose income, and/or leveraging these and other
means to secure their agreements to pay money to Defendants, thus constituting an injury to
Plaintiffs' property within the meaning of 18 U.S.C. § 1964.

383.    Defendants' misrepresentations secured the default judgments that caused
concrete injury to Plaintiffs' property. As a result, Plaintiffs have suffered damage to their
property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants in violation of 18
U.S.C. § 1962(c).

384.    Defendants' conduct has involved and continues to pose a threat of long-term
illegality since it is believed to have commenced eight years ago and has continued to the
present. The pattern of racketeering activity has been directed towards thousands of persons,
including Plaintiffs, and the pattern has spanned many years.

385.    For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains, and to refrain from engaging in similar conduct in the future.

## THIRD CAUSE OF ACTION
(Civil RICO, 18 U.S.C. § 1962(d))

386.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 385 above.

387.    In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that, beginning no later than early 2005 and continuing through today, they knowingly agreed and conspired to conduct or participate in, directly or indirectly. the affairs of the Enterprise through the pattern of racketeering activity described above.

388.    The volume and frequency of the fraudulent activity, and the continuance of the scheme for over eight years, could not have occurred without the consent and knowing collusion of Defendants and other conspirators.

389.    As part of, and in furtherance of, their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that those acts were in furtherance of that pattern of racketeering activity.  As part of and in furtherance of their conspiracy, each Defendant agreed to and did commit at least two predicate acts of racketeering.

390.    Plaintiffs' property interests have been injured by, and as a direct and proximate result of, Defendants' violations of 18 U.S.C. § 1962(d).

391.    By reason of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
(NY GBL § 349)

392.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 391 above.

393.    New York General Business Law section 349(a) prohibits "deceptive acts or

practices in the conduct of any business, trade or commerce or in the furnishing of any service in

this state."

394.    An individual "injured by reason of any violation of this section may bring an

action in his own name to enjoin such unlawful act or practice, an action to recover his actual

damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law

§ 349(h).

395.    Defendants engaged in deceptive acts and practices in the conduct of their

businesses.

396.    Defendants' conduct has had a broad impact on consumers at large.

397.    Defendants committed the deceptive acts and practices willfully and/or

knowingly.

398.    Defendants' wrongful and deceptive acts have caused injury and damages to

Plaintiffs and class members and unless enjoined, will cause further irreparable injury.

399.    Defendants' violations include, but are not limited to:

   a.  Commencing suits against Plaintiffs without undertaking a meaningful review
       of each claim;

   b.  Commencing suits against Plaintiffs without any verifiable basis for each
       claim and without the ability or intent to obtain the documentation necessary
       to prove each claim;

   c.  Falsely verifying complaints;

   d.  Seeking amounts not expressly authorized by agreement;

e. Filing or causing to be filed false affidavits of service in support of applications for default judgments;

f. Filing false Affidavits of Facts in support of applications for default judgments;

g. Filing false and deceptive affirmations in opposition to orders to show cause seeking to vacate these default judgments;

h. Taking actions to execute judgments, including garnishment and bank account restraint, with insufficient care, on the wrong consumers, and on the basis of fraudulently obtained default judgments;

i. Unlawfully retaining funds obtained through execution of judgments after those judgments have been vacated; and

j. Engaging in harassing, oppressive, and abusive litigation conduct.

400.    As a direct and proximate result of these violations of section 349 of the General

Business Law, Plaintiffs and putative class members have suffered compensable harm and are entitled to preliminary and permanent injunctive relief, and to recover actual and treble damages, costs and attorney's fees.

## FIFTH CAUSE OF ACTION

(NY Jud. Law § 487)

(Against Defendants Pressler, Franklin, Wang, Zipkin, Stiller, and Pressler John/Jane Does 1-20)

401.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 400 above.

402.    The New York Judiciary Law section 487(1) states that "an attorney or counsel who . . . is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law . . . forfeits to the party injured treble damages, to be recovered in a civil action."

403.    Defendants Pressler, Franklin, Wang, Zipkin, Stiller, and Pressler John/Jane Does 1-20 violated section 487 of the New York Judiciary Law by engaging in deceit or collusion, or consenting to deceit or collusion, with the intent to deceive courts and opposing parties.

59

404.   Defendants committed the above-described acts willfully and/or knowingly.

405.   Defendants' wrongful and deceptive acts have caused injury and damages to

Plaintiffs and putative class members and unless enjoined, will cause further irreparable injury.

406.   Defendants' violations include, but are not limited to:

   a. Commencing suits against Plaintiffs without undertaking a meaningful review
      of each claim;

   b. Commencing suits against Plaintiffs without any verifiable basis for each
      claim and without the ability or intent to obtain the documentation necessary
      to prove each claim;

   c. Falsely verifying complaints;

   d. Seeking amounts not expressly authorized by agreement;

   e. Filing or causing to be filed false affidavits of service in support of
      applications for default judgments;

   f. Filing false Affidavits of Facts in support of applications for default
      judgments;

   g. Filing false and deceptive affirmations in opposition to orders to show cause
      seeking to vacate these default judgments;

   h. Taking actions to execute judgments, including garnishment and bank account
      restraint, with insufficient care, on the wrong consumers, and on the basis of
      fraudulently obtained default judgments;

   i. Unlawfully retaining funds obtained through execution of judgments after
      those judgments have been vacated; and

   j. Engaging in harassing. oppressive, and abusive litigation conduct.

407.   As a direct and proximate result of these violations of section 487 of the New

York Judiciary Law, Plaintiffs and putative class members have suffered compensable harm and

are entitled to recover actual and treble damages.

**WHEREFORE**, Plaintiffs respectfully pray that this Court enter judgment jointly and

severally as against all Defendants:

I)    Certifying this case as a class action, pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with a class defined as:

> All individuals who have been or will be sued in New York City Civil Court by Pressler as counsel for Palisades Collection and/or Asta to collect alleged AT&T Wireless debts;

II)    Declaring that:

A)    Defendants made false and misleading representations, used deceptive means, and engaged in unfair and abusive practices, in violation of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§1692d, 1692e, and 1692f, when they (i) commenced suits against Plaintiffs without undertaking a meaningful review of each claim; (ii) commenced suits against Plaintiffs with any verifiable basis for each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; (iii) filed or caused to be filed falsely verified complaints; (iv) sought amounts not expressly authorized by agreement; (v) filed or caused to be filed false affidavits of service; (vi) filed or caused to be filed false Affidavits of Facts in support of applications for default judgments; (vii) took actions to execute judgments, including through garnishment and bank account restraint, with insufficient care, on the wrong consumers, and on the basis of fraudulently obtained default judgments; (viii) unlawfully retained funds obtained through execution of judgments; and (ix) engaged in harassing, oppressive, and abusive litigation conduct;

B)    Defendants form an enterprise and constitute an association-in-fact within the meaning of 18 U.S.C. §1961(4) and that this enterprise is engaged, directly or indirectly, in a pattern of racketeering activity in violation of 18 U.S.C. §§1962(c) and (d) by using mails and wires to perpetrate a scheme to defraud and to obtain money or property, and that this scheme includes but is not limited to (i) commencing suits against Plaintiffs without undertaking a meaningful review of each claim; (ii) commencing suits against Plaintiffs with any verifiable

basis for each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; (iii) filing or causing to be filed falsely verified complaints; (iv) seeking amounts not expressly authorized by agreement; (v) filing or causing to be filed false affidavits of service; (vi) filing or causing to be filed false Affidavits of Facts in support of applications for default judgments; (vii) taking actions to execute judgments, including through garnishment and bank account restraint, with insufficient care, on the wrong consumers, and on the basis of fraudulently obtained default judgments; (viii) unlawfully retaining funds obtained through execution of judgments; and (ix) engaging in harassing, oppressive, and abusive litigation conduct;

   C)  Defendants willfully and/or knowingly engaged in deceptive acts and practices in the conduct of their business, in violation of the New York General Business Law § 349(a), when they (i) commenced suits against Plaintiffs without undertaking a meaningful review of each claim; (ii) commenced suits against Plaintiffs with any verifiable basis for each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; (iii) filed or caused to be filed falsely verified complaints; (iv) sought amounts not expressly authorized by agreement; (v) filed or caused to be filed false affidavits of service; (vi) filed or caused to be filed false Affidavits of Facts in support of applications for default judgments; (vii) took actions to execute judgments, including through garnishment and bank account restraint, with insufficient care, on the wrong consumers, and on the basis of fraudulently obtained default judgments; (viii) unlawfully retained funds obtained through execution of judgments; and (ix) engaged in harassing, oppressive, and abusive litigation conduct;

D)     Defendants Pressler, Franklin, Wang, Zipkin, and Stiller willfully and/or knowingly engaged in deceit or collusion, or consented to deceit or collusion, with the intention to deceive courts and opposing parties, in violation of the New York Judiciary Law § 487(1), when they (i) commenced suits against Plaintiffs without undertaking a meaningful review of each claim; (ii) commenced suits against Plaintiffs with any verifiable basis for each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; (iii) filed or caused to be filed falsely verified complaints; (iv) sought amounts not expressly authorized by agreement; (v) filed or caused to be filed false affidavits of service; (vi) filed or caused to be filed false Affidavits of Facts in support of applications for default judgments; (vii) took actions to execute judgments, including through garnishment and bank account restraint, with insufficient care, on the wrong consumers, and on the basis of fraudulently obtained default judgments; (viii) unlawfully retained funds obtained through execution of judgments; and (ix) engaged in harassing, oppressive, and abusive litigation conduct.

III)     Enjoining and directing Defendants:

A)     to comply with the NY CPLR in their debt collection activities;

B)     to cease engaging in debt collection practices that violate the FDCPA, RICO, New York GBL § 349, and New York Jud. Law § 487;

C)     to cease filing any actions to collect debts unless they have a verifiable basis for each claim, undertake a meaningful review of each claim, and have the documentation necessary to prove each claim, or the ability and intent to obtain such documentation;

D)     to ensure that the process servers Defendants hire serve process in compliance with the law in any and all future actions;

63

E)      to produce and file Affidavits of Facts in future actions that truthfully and

accurately reflect the affiant's personal knowledge of the facts, or lack thereof;

    F)      to cease engaging in harassing, oppressive, or abusive litigation conduct;

    G)      to notify members of the class that

          (i) a judgment has been entered against them, and

          (ii) that they have the right to file a motion with the court seeking to

vacate that judgment and to re-open their case;

    H)      to provide each class member with a copy of the complaint and affidavit

of service filed in his or her action; and

    IV)    Awarding to Plaintiffs:

    A)      actual and/or compensatory damages against all Defendants in an amount

to be proven at trial;

          B)      treble damages pursuant to RICO;

          C)      statutory damages pursuant to the FDCPA;

          D)      treble damages pursuant to GBL § 349;

          E)      treble damages pursuant to NY Jud. Law § 487 against the Pressler

Defendants; and

          D)      disbursements, costs, and attorneys' fees pursuant to the FDCPA, RICO,

and NY GBL § 349; and

    V)      Granting such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable by a jury.

Dated: New York, New York
April 11, 2014

NEW YORK LEGAL ASSISTANCE GROUP
YISROEL SCHULMAN, ESQ.

By: _____

Jane Greengold Stevens, of counsel
Danielle Tarantolo, of counsel
Julia Russell, of counsel
7 Hanover Square, 18th Floor
New York, NY 10004
Telephone: (212) 613-5000
Facsimile:  (212) 750-0820
Email: jstevens@nylag.org
Email: dtarantolo@nylag.org
Email: jrussell@nylag.org

HUGHES HUBBARD & REED LLP

By: _____

Diane E. Lifton
Shannon F. Green
Meaghan C. Gragg
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
Email: lifton@hugheshubbard.com
Email: greens@hugheshubbard.com
Email: gragg@hugheshubbard.com

*Attorneys for Plaintiffs*